**STATE, Plaintiff-Appellee v. MENKE, Defendant-Appellant.**

Ohio Appeals, Second District, Darke County.

No. 621.   Decided March 5, 1944.

Richard E. Hole, Pros. Atty., Greenville, Sam D. Kelly, Associate Counsel, Dayton, for plaintiff-appellee.

Murphy & Staley, Greenville, Kusworm & Kusworm, Dayton, for defendant-appellant.

William A. Belt, Toledo, as Amicus Curiae.

**OPINION**

By BARNES, P. J.

The above entitled cause is now being determined as an error proceeding for reason of defendant's appeal on questions of law from the judgment of the court of Common Pleas of Darke County, Ohio.

On March 31, 1943, defendant Joseph Menke was indicted by the grand jury of Darke County, Ohio, of the crime of embezzlement as defined in §12467 GC. The indictment, omitting the formal parts, alleged that,

"One Joseph Menke, late of said county, between the 4th day of April in the year of our Lord one thousand nine hundred and thirty-six and the 22nd day of August, 1938, in the county of Darke, aforesaid, being the duly appointed, qualified and acting co-administrator de bonis non of the estate of V. S. Marker, deceased, did unlawfully and fraudulently embezzle and convert to his own use certain money of the amount and value of Four thousand, three hundred, twenty-seven and 95/100 ($4,327.95) dollars of the personal property of and belonging to the said estate of V. S. Marker, without the consent of any owner or owners of said personal property, which said personal property had then and there come into the possession and care of him, the said Joseph Menke, by virtue of his appointment as co-administrator de bonis non of the estate of V. S. Marker, deceased, as aforesaid;"

**Section 12467 GC,** deleted so as to apply to the indictment in the instant case, reads as follows:

"Whoever being an * *.* administrator * * * embezzles or converts to his own use, fraudulently takes or makes away with * * * anything of value which shall come into his possession by virtue of his * * * appointment * * * if the total value of the property embezzled in the same continuous employment or term of office, whether embezzled at one time or at different times within the three years prior to the inception of the prosecution, is $35.00 or more, shall be imprisoned, etc."

. The case came on for trial before a specially designated Common Pleas Judge and a jury and after the case was fully submitted, the jury returned a verdict of guilty, fixing the amount of money embezzled at the sum of $1500.00.

Thereafter, a motion for new trial was filed, overruled and sentence imposed on the verdict.

Within proper time the defendant-appellant filed notice of appeal together with transcript of docket and journal entries, original papers, including bill of exceptions and thus lodged the case in our court. The bill of exceptions conains some 335 pages together with numerous exhibits attached.

While the bill of exceptions is lengthy, there is not as much controversy on factual questions as would be expected in a record of this size.

Most of the evidence is directed to detail, giving color to the contentions of the respective parties, rather than any dispute on basic facts.

Defendant-appellant's assignments of error are set out in nineteen separately stated and numbered specifications. Counsel for appellant have grouped these assignments under the legend group number A, B, C, D and E together with a conclusion under which numerous authorities are cited with comments.

Authorities are also cited and comments made under the various groupings. As briefly as possible we will now summarize the essential factual questions necessary to an understanding of what the jury had before it.

The defendant, Joseph Menke, together with J. Edward Williams, on November 30, 1927, were appointed co-administrators de bonis non of the estate of V. S. Marker, deceased, who died intestate, a resident of Darke County, Ohio, in October, 1918. His estate had been in process of administration from the day of his death up until the present time. Numerous persons have essayed to administer the estate, many of them resigning and successors being appointed. The administrator immediately preceding the defendant and his co-administrator, was Hon. Martin B. Trainor who died before completing the task of administration.

Mr. Menke's co-administrator died on the 26th day of June, 1942.

On March 15, 1943, Mr. Menke, together with the administrators of J. Edward Williams filed a third account in this Marker estate, showing a balance on hand of $21,903.31.

The second account had been filed in February, 1935. The co-administrators, Joseph Menke and J. Edward Williams, at the time of their appointment and continuously thereafter until the death of J. Edward Williams, were cashiers of two separate banks located in Greenville, Darke County, Ohio. The defendant, Mr. Menke had been cashier of The Farmers National Bank of Greenville for some twenty years and still was so acting at the time of the trial. These two administrators, after their appointment, divided the funds practically 50-50 and deposited the same in checking accounts in their respective banks. Following the filing of the second account, exceptions were filed by creditors distributees and/or interested parties. A number of questions were raised through the exceptions but all were decided adversely to the exceptors, except the question as to whether or not the administrators should be charged with interest on the funds in their hands supposedly in the checking accounts in their respective banks. This question was carried to the Supreme Court and there decided against the administrators. The amount adjudged against them was approximately $9500.00. Immediately following the decision of the Supreme Court, Mr. Menke caused to be deposited under date of March 14, 1939, in the savings account in his bank the sum of $5600.00. The ledger sheet introduced in evidence being plaintiff's exhibit No. 3, shows very little addition to this savings account except four items of interest. From time to time there were withdrawals from this account, the last being June 18, 1942 and this withdrawal took up the entire balance and closed the account. On March 14, 1939, when the $5600.00 was withdrawn from the checking account and placed to the credit of the savings account, $3200.00 was deposited in the checking account and this amount was necessary in order to cover the $5600.00 withdrawn. There is some question as to the source of the $3200.00. The State argued inferentially that it must have been supplied by Mr. Menke, since the third account discloses no item of receipt at this or near this date in any amount. Counsel for defendant question the argument of the prosecuting attorney but so far as we are able to find, the record gives no explanation. Following the transfer of the $5600.00 from the checking account to the savings account, there was left a balance in the checking account of $84.65.

We now approach the detailed transactions which lead up to and include the $1500.00 item claimed to have been embezzled by the defendant.

Prior to 1932, S. F. Ludy had been engaged in the creamery business in Darke County. He conducted his banking business with The Farmers National Bank of which Mr. Menke was the cashier. He became financially involved and was indebted to the bank more than he could pay. On January 2, 1932, he made a conveyance of his real estate to the defendant, Joseph Menke. Mr. Menke testified that this conveyance was solely for the benefit of the bank, although there was nothing in the deed itself so indicating. On Feb. 5, 1935, Mr. Menke executed a deed to The Farmers National Bank for this same property. The deed contained the following recital: "No money consideration passing, therefore, no revenue stamps required." On April 9, 1935, Mr. S. F. Ludy executed a bill of sale to The Farmers National Bank for the personal property and equipment used by him in the creamery business. This might indicate that from 1932, when the deed was made to Mr. Menke, to April 9, 1935, when the personal property and equipment was transferred to the bank, that Mr. Ludy might have continued to operate his creamery business.

Later in 1935, a corporation was organized by the name of Springbrook Dairy Inc. The stockholders of this company were made up mostly of the officers and the attorney of the bank. Mr. Menke was one of this number. The total capitalization and the shares held by each stockholder is not disclosed. On November 18, 1935, The Farmers National Bank executed a deed of conveyance of what was originally this Ludy property to the Springbrook Dairy Inc. and on the same date the Springbrook Dairy Inc. executed to The Farmers National Bank, a mortgage in the sum of $12,800.00. This mortgage was cancelled of record April 24, 1941. On April 14, 1941, the Springbrook Dairy Inc. executed a deed for this same property to The Farmers National Bank. It conclusively appears that following the acquisition of this property by the Springbrook Dairy Inc. it was continuously in financial distress. It opened up an account with The Farmers National Bank but frequently was without any balance. The Springbrook Dairy Inc. apparently had an arrangement with the bank through which it would issue to the farmers and others from whom it purchased products, weigh bills with a calculation of the amount due and the individual would then take the weigh bills to the bank and receive the money due him. From time to time and within a few days of the transaction the dairy company would issue check to take up these weigh bills.

In the interim the bank would carry these weigh bills in what was designated "cash items". This is not an uncommon practice with banks but not for customers who are not financially able to take care of such "cash items" or have no financial rating entitling them to credit. In August, 1938, the bank had on hand a little less than $1500.00 of these cash items and the dairy company was without funds with which to take the amount up. On August 22, 1938, the defendant Menke opened up an account which he called "Milk Fund" and on this same day executed a check signed by himself as administrator of the Marker estate in the sum of $1500.00 and deposited the same to the credit of the "Milk Fund". This is the $1500.00 which, it is claimed, the defendant Menke embezzled. On the same day these cash items in the sum of $1495.26 were charged against the account, thus leaving in this Milk Fund account $4.74. This Milk Fund account continued active until January 14, 1943, when it was closed. Following the $1500.00 deposit, from time to time there were other deposits to the number of fourteen. The source of these fourteen deposits in the Milk Fund is not definite although there is some direct evidence as to part of them coming from the Marker Estate. After the original deposits in this Milk Fund account the balance was less than $500.00 except on May 16, 1942 when the balance was $1032.95, May 5, 1942 $582.95 and January 14, 1943, $511.93.

The disbursements, as disclosed from the ledger sheet, were five in number and totalled approximately $4,144.60.

In counsel's brief, there is much discussion as to what characterization should properly be given to this Milk Fund account. The defendant testified and his attorneys argued that in fact it was the bank; the legend "MF" was nothing more than a name. This argument is based on the fact that the M. F. fund was used to take up cash items held by the bank by reason of the Springbrook Dairy Inc. not having funds sufficient to take care of these cash items. The following added facts may be helpful if it is necessary or essential to determine the nature of this account. If not directly shown, it is inferable that the plan was conceived in the mind of the defendant Joseph Menke. It is doubtful if any officer or member of the Board of Directors of the bank had any knowledge that such an account existed. It is definitely shown that no action of the Board of Directors was ever taken thereon. The assistant cashiers, bookkeeper and possibly the other employees in the bank knew about it in a general way from their routine handling of the ledger sheets. No one but Menke ever placed

any credits to the account and likewise the inference is conclusive that nobody but Menke made any withdrawals from the account. Plaintiff's Exhibit No. 7 is a copy of a check in the sum of $1138.05 payable to Joseph Menke, Administrator, dated January 14, 1943 with the following legend "Repayment June 3, 1939" and signed Milk Fund by Jos. Menke. Whatever may be the characterization of this M. F. account, the sole and only inference that can arise is that it was in the absolute control of Joseph Menke. Of course, the ledger sheet and the entries thereon would be the work of the bookkeeper or some other employee but the ledger sheet and entries thereon would merely reflect the deposits and withdrawals made by defendant Menke. We think we are safe in saying that this situation could never arise in any bank except where the administrator of an estate was also cashier or managing head of the bank. Counsel for Menke further argue that he never received a cent by reason of this plan and that what he did was entirely for the bank. It is doubtful if this statement is correct. It must be remembered that the defendant Joseph Menke was a stockholder in the Springbrook Dairy Inc. and at the same time he was cashier of The Farmers National Bank. It is possible, and probable, that defendant was representing conflicting interests. Undoubtedly he was interested in the continuance of the Springbrook Dairy Inc. as a going concern, probably with an idea of selling it as a business rather than close it out and junk its equipment.

As cashier of the bank and its managing head, it was his duty to look after its interests. It is very doubtful if a cashier of a bank would, for a moment, countenance a concern without funds and with no credit rating to issue checks and have the same taken care of by the bank. In other words, a cashier who is looking after the interests of the bank would never permit a situation to arise through which a defunct corporation would become indebted to the bank by reason of the latter taking up bad checks. We understand fully that the cashier would be concerned in carrying practically $1500.00 in cash items against the defunct concern when he knew, as every cashier would know, that, when the bank examiner appeared, this transaction would be severely criticized and the officers of the bank required to make good. Admittedly, this was the situation confronting the defendant Menke when he conceived the idea of opening up this Milk Fund account and, by transferring funds in his hands as administrator, thus be able to clean up

the cash items which any cashier would know would be one of the first things a bank examiner would discover.

A bank examiner does not generally go through the private checking accounts except as to totals. This is necessary in order to check the bank statement. The plan adopted by Menke did make him reasonably secure against a bank examiner's criticism and finding.

Under this situation I hardly think it is proper to say that the defendant Menke received no benefits by reason of his creation of the Milk Fund. Probably this benefit was anticipatory rather than real. There is evidence that the property of the Springbrook Dairy Inc. was finally conveyed to the bank and the stockholders required to make up the balance on their note liability.

Counsel for defendant concede, as they must, that Mr. Menke acted improperly in transferring funds from the administrator account to the Milk Fund account.

Another factual question having some bearing on the question of intent is that on June 18, 1942 the Menke and Williams administrator savings account was closed out leaving no balance. This is disclosed from the copy of the bank's ledger sheet, being Plaintiff's Exhibit No. 3. No amount was placed in the savings account thereafter. On July 15, 1942 the balance in the Menke and Williams administrators checking account was $61.65. This is exemplified from examination of plaintiff's Exhibit No. 2, being copy of ledger sheet of the administrator account in The Farmers National Bank. There was also introduced in evidence, plaintiff's Exhibit No. 5-A which purports to be a ledger sheet of The Farmers National Bank of the account of Menke and Williams, Administrator, showing a balance of $4389.60 under date of July 15, 1942. Mr. Menke testified that this ledger sheet, to-wit: Exhibit No. 5-A, was never intended as a bank record but was simply a copy made for his personal use. However, he did testify that through inadvertence this sheet was in the bank files for a few days in place of plaintiff's Exhibit No. 2. Mr. Menke gives as his reason for making this copy that, in previous years, covering much litigation involving the estate, some papers would always come up missing. From this evidence we think that he claims this as a major reason for making the copy.

His counsel argue, it served the purpose of keeping a record of the exact status of what the Marker Estate account should be, if withdrawals had not been made therefrom for deposit in the Milk Fund and the fact that he used a sheet such as ordinarily used as regular ledger sheets was merely

incidental. The State argues that it was intended eventually to be substituted for Exhibit No. 2 and thereby eliminate all evidence of the improper withdrawals from the administrator account. As a basis for the State's argument, it points out that when the grand jury of Darke County was investigating a complaint against Probate Judge Miles for soliciting a bribe and in which the administrators and their attorney were supposedly involved, a subpoena duces tecum was issued to an assistant cashier of The Farmers National Bank to bring with him certain ledger sheets showing the status of the account in the Marker Estate. The claim is made by the State that Mr. Menke sought to have the assistant cashier take what is herein designated as plaintiff's Exhibit No. 5-A rather than Exhibit No. 2. In fact it might be stated that this investigation before the grand jury of the complaint against Judge Miles was the source of information through which the grand jury returned its indictment against the defendant charging him with the crime of embezzlement. Mr. Menke very vehemently denies that he said anything to the assistant cashier which could be construed as any attempt on his part to influence the action of such witness. Another assistant cashier from the bank was called at a later time and in his examination in chief, indicated that Mr. Menke wanted him to bring what has been referred to in the case as plaintiff's Exhibit 5-A. This witness, in cross-examination, qualified his statement somewhat and admits that the question under discussion was just what the prosecutor wanted. In other words, they did not think that the subpoena duces tecum was understandable. In this conversation, Mr. Billingsley, attorney for the bank, was called in and after reading the subpoena and hearing the explanation of Mr. Menke and the assistant cashier, said that the witness should take the Exhibit No. 2.

At or about this time Menke further testified that he went to Mr. Billingsley's office for the purpose of talking to him about some matters connected with the estate and had with him the ledger sheet Exhibit No. 2 and, what he designated as his private paper, "Exhibit 5-A" and at the end of the conversation, Mr. Billingsley wanted to retain these ledger sheets. Menke says that he advised Billingsley that it was necessary to return one of them so that the bookkeeper could make up the daily statement; that inadvertently the sheet that is now marked State's Exhibit No. 2 was left with Mr. Billingsely and the other sheet marked Plaintiff's Exhibit No. 5-A was returned and placed in the ledger sheet file. At this time the balance on

both sheets was the same and for the purpose of the daily statement, either would give the bookkeeper adequate information. Within a few days the sheet was returned by Mr. Billingsley and immediately thereafter Mr. Menke talked with the bookkeeper as to which was the proper sheet for the file and very quickly determined that what is now plaintiff's Exhibit No. 2 was the one to go into the ledger sheet file. The correction was then made.

At this point we might briefly explain the variance in the amount as charged in the indictment and the verdict of the jury giving the amount embezzled as $1500.00. It will be recalled that the amount stated in the indictment was $4,327.95 and the time of the claimed embezzlement was between the 4th day of April, 1936 and the 22nd day of August, 1938. It clearly appears that the first deposit in the Milk Fund account was $1500.00 and the deposit was made on August 22, 1938. This is the last day designated in the indictment. There was evidence that subsequently other moneys were taken from the administrator's account and placed in the Milk Fund account, but the date of such transaction being subsequent to that laid in the indictment and the bill of particulars, the same could not be considered by the jury except as such transactions would bear on the question of intent. It is now the claim of the State that, save for the allegation as to time in the indictment and reaffirmed in the bill of particulars, the evidence would support an embezzlement in the sum of $4,327.95.

The assistant prosecuting attorney, in his argument to the jury, sought to explain the discrepancy in amount and thereafter said that the State was not concerned as to the exact amount and since the evidence conclusively established that the $1500.00 item was within the time laid in the indictment, invited the jury to return a verdict fixing $1500.00 as the amount of the embezzlement and forget the balance. In this connection the prosecutor further stated that he doubted if the evidence would establish to the degree of certainty required under the law that a larger amount than the $1500.00 was proven.

This question is really unimportant and is nothing more than explanatory.

While there are other facts presented in the record of more or less importance, we refrain in the interest of shortening the opinion from any further recital.

Counsel for the defendant protected his record by making a motion for directed verdict at the close of the State's testimony; renewed following the introduction of all the testimony,

renewed after the verdict on motion for judgment notwithstanding the verdict and is the major contention as set out in assignments of error and appellant's brief.

In fact, all the assignments of error, with the exception of some claimed errors in the trial, which we will refer to later, may be encompassed under the claim that the verdict was contrary to law; that there was no supporting evidence to justify it; that the verdict was contrary to the evidence, first on the ground that there was no evidence on one of the essential elements included in the indictment and second, if there was any evidence justifying the submission of the case to the jury, the verdict was against the manifest weight thereof.

The particular element around which the discussion raged is that of "intent".

In other words, counsel for defendant-appellant very earnestly and logically argue that, conceding all the factual questions as presented in the record, there is an absolute failure to prove a criminal intent. It is argued that embezzlement is a species of larceny, the only distinction being that in the crime of larceny there is a trespass in the taking of the property followed by intent to convert to the taker's use; whereas, in a charge of embezzlement, the property in question is in the lawful possession of the accused and to support a charge of embezzlement, it must be shown that the accused converted it to his own use with the intent to steal it. Counsel for defendant-appellant present a splendid brief citing numerous authorities, not only from the courts of our state but also from other jurisdictions, and including decisions of the United States Supreme Court. We think that we can safely say that the citation of supporting authorities is complete and nothing further could be found through independent research. In the conclusion of appellant's brief, counsel make the following **statement,**

"The situation presented is quite novel; there are no available precedents; the adjudicated authorities, meager and incomplete as they are, afford the court with very little guidance in reaching a proper conclusion. The case is, in fact, one of first impression."

We have examined each and every case presented in counsel for defendant's brief but find nothing positively supporting.

We find the cited case of **State of Ohio v Baxter, 89 Oh St 269,** interesting but not helpful to defendant. In this case,

Baxter, a superintendent of banks, took $37,000.00 of the funds that came into his custody by virtue of his office, to New York City and used the money there to redeem his collateral securities which he had pledged for his private debt. Some weeks later before he was called to account for the money and also before he was indicted for its unlawful conversion to his own use, he negotiated the securities which he had thus obtained for money with which he restored to the state funds, the $37,000.00.

The trial court directed a verdict apparently upon the ground that the defendant had restored the funds and therefore had not defaulted. The State carried the case to the Supreme Court on exceptions and the exceptions were sustained. The Supreme Court in its syllabus determined that under the facts the defendant was guilty of embezzlement and the fact that he returned the money in an equal amount to the trust fund before his secret appropriation of it became known was no defense. The third syllabus reads as follows:

"It is the design and policy of that section (12876 GC) and kindred statutes to prevent public officers and agents from using public funds in their possession or under their control, in any manner or form or for any purpose not expressly authorized by law."

It is true that this was a prosecution under §12876 GC, whereas the instant case is brought under §12467 GC.

The two sections are not in all respects the same but in most instances are identical. As applicable to the instant case, there is no variance in substance. It will be observed that §12467 GC under which the indictment was returned in the instant case in part reads:

"Whoever being an * * * embezzles or converts to his own use, fraudulently takes or makes away with * * * anything of value which shall come into his possession by virtue of his appointment, etc."

This part of §12467 GC is identical in substance with the corresponding part of §12876 GC. Counsel for appellant in their brief and particularly the brief of Mr. Belt as amicus curiae, argue that the terms "embezzles" or "converts to his own use" "fraudulently takes or makes away with" are synonymous terms.

We doubt this very much. In the first place, it is a rule of statutory construction that all words or phrases in a sec-

tion are placed therein and should be given their ordinary meaning, unless, from the context, it is clearly discernible that certain words or phrases are synonymous with other parts of the section. When the section in question says "embezzles" or "converts to his own use" we are at once led to the conclusion that the words "converts to his own use" probably have a distinctive meaning from the word "embezzles".

As we read the opinion of Wilkin, J., in the Baxter case, supra, he finds a distinction between the two. Ordinarily the opinion is that of the Judge writing same and is generally defined as dictum but we are inclined to think that it has its place as determinative of the legal principle involved as found in the syllabus. Even if nothing more than dictum, we consider it a well reasoned statement and therefore adopt it. We quote from page 272,

"It will be noticed that the predicate words of the statute are 'to **embezzle** or to **convert** to his own use.' The meaning of these words is to be found in the body of the general law; they are legal terms which are to be understood according to their legal signification. A precise laconic definition of either of them, which will comprehend their full import and cover all cases, can not be found, if indeed one can be made. Conversion has been defined as follows: 'An appropriation of the thing to the party's own use and beneficial enjoyment, or exercising dominion over it, in exclusion or defiance of the owner's right.' (2 Greenl. Ev., Sec. 642) 'Assuming upon one's self the property and right of disposing of another's goods.' (Lord Holt, 6 Mod. 212.) 'An act of dominion over personal property, inconsistent with the right of the owner.' (Bigelow on Torts, 1875, 428.) 'Any distinct act of dominion wrongfully exerted over one's property in denial of his right or inconsistent with it.' (2 Cooley on Torts, 3 ed., 859.) And see 1 Bouv. Dic. (1897), 433; 38 Cyc., 2005."

Thereafter follows the definition of embezzlement as follows:

"A definition of embezzlement is still more difficult to find or to frame. It is a form of the evolution of the law of larceny, and therefore a modification of that crime. The act may be said to consist of a fraudulent misappropriation of another's goods by one to whom their custody has been entrusted. It is purely a statutory offense, and the distinctive features of

the crime must be gleaned from the various statutes which define it for each jurisdiction."

Of course, it must be recognized that the word "convert" means a felonious conversion.

Counsel for the state rely to a great extent on the case of **Ohio v Dickinson,** decided by our court and found in **34 Abs 559.** The Dickinson case and the instant case had a similarity in that both defendants were fiduciaries; Miss Dickinson being a guardian and Mr. Menke an administrator. The Dickinson case was much stronger in its facts supporting the guilty verdict than the instant case. In the reported case Miss Dickinson withdrew the funds from time to time and used the same for "normal living and office expenses" without the means of restoring when called upon to account. The amount of the fund in her hands as guardian was $10,000.00. This was largely in excess of her net worth. It is true that she testified that she intended to restore the amount and had no intention of permanently depriving her ward of a full accounting. She turned over to her bondsman all her property and assigned a prospective interest in a fee which she expected to receive in a law suit commonly known in Columbus as the "Hot Mix" case. The fee has since been allowed and collected by the bonding company but there was still a deficit in a substantial amount.

In 1932 the Court of Appeals of Scioto County handed down a decision in the case of **Tidd v State of Ohio (12 Abs 216).** In this case Marguerite Clark Tidd was found guilty in the Court of Common Pleas of embezzling and converting to her own use certain public funds which came into her possession and under her control as Clerk of the Municipal Court of the city of Portsmouth, Ohio. The indictment was returned under §12873 GC. The verdict of conviction and judgment on the verdict was sustained. The case of State v Baxter, supra, was cited and followed. The section of the code under consideration was not the same as in the case of Ohio v Baxter. The section of the code in the Tidd case was more stringent in that it specifically designated the acts that would constitute embezzlement, whereas the section under which the indictment was drawn in the Baxter case supra was very general in its provisions, simply providing "whoever * * * embezzles or converts to his own use" etc., is guilty of embezzlement. Counsel for defendant-appellant in their brief, point out the distinguishing features between §12873 **GC** involved in the Tidd case and §12467 GC involved in the instant case.

We have searched in vain for any claimed distinguishment between §12876 GC in which the indictment was returned in the Baxter case, supra, and §12467 GC in which the indictment was returned in the instant case. We have heretofore pointed out that the parts of the two sections defining the offense are identical. The only distinction is that the persons referred to are different. In other words, if the "whoever" listed under §12467 GC were grouped with the "whoever" listed under §12876 GC, then the remainder of either section could be adopted and the identical offense defined in one section instead of two.

When we find that the Supreme Court has construed §12876 GC as it did in State v Baxter, supra, a rule of stare decisis requires us to follow the Supreme Court decision in the instant case when considering the identical language in §12467 GC.

The claim may be made that the general law as it relates to public officials and their handling of money that comes into their hands is so positive in character that any divergence from such method would constitute embezzlement. If the Supreme Court had been considering §12873 GC then we could see the force of such an argument. May it be said that the Supreme Court in the Baxter case, supra, had in mind this situation. If so, no reference thereto was made either in the syllabus or in the opinion. As we read this decision of the Supreme Court it predicated its decision on the provisions of §12876 GC alone.

We think it may be conceded that the Supreme Court in the Baxter case, whether mentioned or not, must have had in mind the statutory provisions controlling the handling of the funds coming into the hands of defendant as Superintendent of banks. There is a recital in the opinion that the defendant had withdrawn the funds from banks where they had been deposited by virtue of §742-6 GC. However, we think it is obvious that under the indictment the court could not give consideration nor effect to criminal §12873 GC.

In the instant case, it is appropriate to have an understanding as to the prescribed statutory duty of Menke in handling funds of the Marker estate. **Sec. 10506-45 GC** provides in substance that a fiduciary, immediately after his appointment and throughout the administration of the trust shall be required to deposit all funds received by him as such fiduciary in one or more depositaries designated as a national bank or state bank. This section also provides that the deposits will be in such class of accounts as will be most ad-

vantageous to the trust and that such depositaries should pay interest at the highest rate customarily paid to its patrons, etc.

**Sec. 10506-41 GC** provides as to the kind and character of investments that a fiduciary may make. Some ten different investments are listed as being within the approved class. The Section provides the following as it relates to administrators or executors,

"Provided that no administrator or executor shall have authority to invest funds belonging to the estate except with the approval of the court or where the will or other instruments creating the trust permits."

Counsel for appellant in their brief argue that the defendant as administrator had the power to do with the funds as he saw fit; that he might have carried them in his pocket, buried them in a tin can or hid them in his house; further, that he might have used them for his own use, might have invested them as he saw fit and might even have loaned them to the Springbrook Dairy Inc., though he knew the company was insolvent. Counsel argue further that any of such acts would not have been embezzlement but would have created a civil liability in the event of loss. We are unable to follow counsel's argument to its full implication. Any deposit of funds by a fiduciary or any investment contrary to the express provisions of the statutory law is wrongful and such wrongful conduct may be the basis of a criminal prosecution depending upon the facts in each particular case.

The statutory provisions for depositaries and investments did not always exist. Some of the early decisions of the Nisi Prius and Circuit Courts under indictments charging embezzlement of fiduciary funds were decided before the depositary and investment enactments. It is argued that these depositaries and investment enactments were for the protection of the fiduciary. This may have been the actuating reason, but the legislature, in making these provisions which would protect the fiduciary, went further and provided what should be done with the funds.

Considering the factual questions in the instant case in connection with the statutory law as considered by the courts, we find it difficult to say that the case of State v Baxter, supra, does not control it. It will be remembered that the Supreme Court in the Baxter case, supra, said that the specific act constituted embezzlement. We examine the syllabus for a pronouncement that the trial court was in error in directing a

verdict but should have submitted the question to the jury as to whether or not there was present criminal intent. It will be found interesting to examine the case of **State v Cameron, et al., 91 Oh St 50,** wherein the Supreme Court in a per curiam again sustains exceptions to the action of the trial court in dismissing the defendant and on the authority of the case of State v Baxter, supra.

We still have a question in the instant case propounded by counsel for the appellant that the defendant did not convert any of the money in the Marker estate to his own use. We have heretofore stated the factual questions rather fully and it will not be necessary to repeat at this time. We do not deem it necessary to determine the status of the Milk Fund and who owned it.

It was the creature of Menke and wholly conceived and controlled by him. It is inferable, if not conclusively shown, that the primary object in its formation was to assist the Springbrook Dairy, Inc. in continuing operations. Mr. Menke was a stockholder in the Springbrook Dairy, Inc. The extent of his holdings or his obligations are not shown. The jury was warranted in finding that he and he alone sanctioned the action of the bank in carrying in cash items the bad checks. The circuitous route taken in handling the money would not alter the object to be obtained. The result would have been no different had Menke issued an administrator's check direct to the Springbrook Dairy Inc. so that it might have had a balance instead of a deficit in its account. The fact that Mr. Menke was only one of several stockholders in the Springbrook Dairy Inc. would not alter the situation. He was an interested and benefited party and, so far as is shown from the record, no other stockholders of the dairy company had any information on this question.

The further fact that the plan did not work successfully would not alter the conclusion. There was an apparent gain to the dairy company in that no interest was paid to the administrator's account on account of the dibursements made to the Milk Fund account. As heretofore stated, this Milk Fund account was operated for a matter of several years. Other items similarly placed in the Milk Fund after the $1500 deposit could be considered on the question of intent.

Counsel for defendant-appellant earnestly argue that there is an absolute failure of proof by the state on the question of criminal intent. In support of this argument, the claim is made that there could be no embezzlement so long as Menke

kept himself financially able to account for the funds charge-able against him in the Marker estate. Attention is called to the evidence through which it was shown that Menke had two or three farms, dairies, farming equipment, owns his own residence and was worth from fifty to one hundred and fifty thousand dollars, and further, that he was in position to settle the Marker estate at any time.

Under the authorities cited, and particularly the Baxter case, supra, we are unable to conclude, as a matter of law, that there was no evidence of criminal intent.

The trial court directed the jury in his general charge to determine the question of criminal intent. It is our conclusion that there was evidence warranting the submission of the case to the jury and that to say the least, the factual question was for the determination of the jury and we are unable to affirmatively find that the verdict is against the manifest weight of the evidence.

We now consider the remaining assignments of error. Assignments 8 and 9 refer to the admission and rejection of evidence. Brief of counsel make no special reference to these assignments in their brief and for that reason we make no comment.

Assignment of error No. 10 complains of the court's general charge to the jury. The first complaint is that the trial court in his instructions to the jury, enlarged the scope of the jury's inquiry which should have been limited to the charge contained in the indictment.

The indictment charged that the defendant did unlawfully and fraudulently embezzle and convert to his own use certain money of the amount and value, etc. The court in its charge said to the jury that it was sufficient to sustain a conviction if the defendant "either embezzled, or converted to his own use, fraudulently took or made away with or secreted with the intent to embezzle or convert to his own use all or some part of the money as alleged in the indictment". The particular words objected to in this part of the charge are "or secreted with the intent to embezzle or convert to his own use". Counsel argue that there was no evidence of any secretion and hence this particuar charge was improper. No doubt this particular language was taken from the applicable section of the code. We are unable to conclude that this part of the charge is erroneous or, if so, that it could possibly be prejudicial. Of course, if there is no supporting evidence, the court could well have omitted it. As heretofore stated, we find no prejudicial error.

The next specific complaint is that the court erred in instructing the jury on the question of intent. Counsel in their brief quote only part of the paragraph. We will quote the entire paragraph so as to have a better understanding as to what the court was talking about.

"One of the elements which the State must prove beyond reasonable doubt is that there was the fraudulent intention upon the part of the defendant to appropriate or convert the property to his own use. This does not necessarily mean that it must have been shown that the defendant intended to actually use the money in question personally, but the proof would be sufficient if it were shown beyond reasonable doubt that there was an intention on the part of the defendant to convert the money or property of the V. S. Marker estate to some person or persons not legally entitled thereto to serve some purpose of defendant."

The part of this paragraph quoted by appellant's counsel standing alone might be subject to objection, but when considered in the light of the entire quoted paragraph, we find no error. In other words, we think the charge of the court on this subject was proper.

The next assignment is that the court erred in not including in his general charge, special requests made by defendant before argument. The principle of law is recognized that in criminal cases, the court is not required to give special requests before argument. However, when such requests are first presented before argument and afterwards renewed following argument, if such requests correctly state the law, the same must be given by the court as requested or in substance. The brief admits that charges 1 to 9 were in part included in the general charge. The specific complaint is made that charges 10, 11 and 12 were not given either as requested or in substance. These requests are rather lengthy and we do not find it necessary to repeat them in their entirety.

Request No. 10, in substance, asked the court to instruct the jury as a matter of law that the commingling of trust funds by an administrator is not unlawful unless it be motivated or accompanied by fraudulent intentions, etc. The first paragraph of this request defined what is understood under the law as commingling.

We think the court properly declined to give this special charge either as requested or in substance for the reason that

there was no evidence presenting the question of commingling of funds and for the further reason that we do not think the request correctly states the law when it says that commingling is not unlawful. In our judgment commingling is unlawful, although it may not, under all conditions, be criminal.

Request No. 11 asked the court to charge the jury as a principle of law that any using or investing of the funds by the defendant under the evidence in the case would not amount to a converting or embezzlement.

The giving of this charge would, in effect, have taken away from the jury its prerogative of determining the question of intent. We think this request was properly refused.

Request No. 12, in substance, asked the court to charge the jury that since the Farmers National Bank of Greenville, Ohio, was in the class of banks properly designated as a depositary that any transfer from one department or activity of the bank to another within the same bank would not be violative of the statute and if the jury should find that this was what was done by the defendant, such conduct would not constitute embezzlement. We think the court acted properly in declining to give this charge.

Complaint is made that the court, in its general charge, made no reference to embezzlement of fiduciaries and no charge on the peculiar questions which fits the case. Reading the court's charge in its entirety, we think the jury was adequately and properly instructed on all issues raised by the indictment. If counsel felt that the court had not fully and adequately instructed on any particular phase of the case, it was then the duty to request the court at the termination of his general charge to further instruct on this subject. In other words, this would come within the category of an omission rather than a commission.

Assignments 11, 12 and 13 all relate to the refusal of the court to give the special charges as requested or the substance thereof. We have already referred to these specific requests and do not think any further statement is necessary.

We find no prejudicial error and therefore the judgment of the trial court will be affirmed.

Exceptions will be allowed to the defendant.

Costs are adjudged against the appellant.

HORNBECK and GEIGER, JJ., concur.

## APPLICATION FOR REHEARING

Decided May 17, 1944.

BY THE COURT:

The above entitled cause is now being determined on defendant-appellant's application for rehearing. The grounds are set forth under five separately stated and numbered assignments. Accompanying the application is a thirteen page brief together with a three page addendum.

In our original opinion we called attention to the case of **State v Baxter, 89 Oh St 269,** and made detailed reference to similarity ·of language of the Code sections under which the indictment was drawn in the Baxter case and the instant case. We made comment to the effect that counsel for appellant had failed to present argument distinguishing the Baxter case from the instant case. The present application for rehearing takes up this challenge and meets our suggestion with a statement that there is as much difference in the two cases as between day and night.

This is a very broad statement but it fails satisfactorily to answer the observations we made in our original opinion. Counsel in their argument make the observation that Baxter's guilt was obvious under the uncontradicted facts.

The trial court thought otherwise and apparently on a kindred theory to that advanced by counsel in the instant case.

In discussing this question in the application for rehearing, counsel again refer to the provisions of §12873 GC and argue that it is an interpreting section controlling §12876 GC.

We are unable to follow this theory. The two sections are independent and while a state of facts might exist which would warrant an indictment under either section, nevertheless the state would be bound by the section selected under its allegation of claimed criminal conduct. The indictment in the Baxter case received no support from §12873 GC, for the reason that the complaint was brought under §12876 GC.

The Supreme Court so recognized the indictment and made no reference to §12873 GC. It is quite true that other sections of the code prescribing duties of public officials in the handling of public funds would necessarily be considered in an indictment under §12876 GC.

Likewise sections of the code making provision as to how administrators and executors and other fiduciaries should handle funds coming into their hands would be invoked in considering §12467 GC under which the indictment was returned in the instant case. Counsel for appellant on page 2 of their brief make reference to certain observations made by Judge Wilkin in the Baxter case as found on page 281 of the opinion. We think a reading of the entire paragraph discloses that the Judge writing the opinion was making reference to a situation entirely different and distinct from the instant case.

We find nothing in counsel's argument under their first proposition which was not considered by us in our original opinion.

While we were considering appellant's application for rehearing and before the opinion was released, we received advice from the original counsel for appellant that Mr. Luther Day and Mr. Earl W. LeFever of Cleveland, Ohio, had been retained by the defendant and requested the opportunity to file further brief on the application for rehearing.

This request was granted and within due time brief was filed by the Cleveland counsel. In this supplemental brief it is stated that in the interest of brevity it shall be their purpose to avoid as much as possible duplication of arguments and authorities and the supplemental brief is confined to argument on a single proposition, but counsel say that they adopt the arguments made by former counsel in their briefs. It is sought to bring the instant case within the rule repeatedly decided by the courts of this state, as well as sister states, that mere bookkeeping transactions or improper entries where no money is actually withdrawn cannot be the predicate of an action. These cases are mostly civil actions and we think are readily distinguishable from the instant case. At the top of page 3 of the supplemental brief counsel make the statement that the milk fund account was set up by defendants as an account of the bank and further that they understand that our court so concluded.

Counsel are in error in this observation. In our original opinion on page 7 we made a very complete statement of the factual conditions attending the setting up of the milk fund account. The inference arising from these facts can leave no other conclusion than that the milk fund account was, in fact, Joseph Menke. The only act in connection therewith was by Joseph Menke. He and he alone set up the account; nobody else knew anything about it. He made all deposits therein. He

issued all checks for the money that was drawn therefrom, signing the checks "Milk Fund by Joseph Menke". It is true that he testified that he set up this fund for the bank but everything he did in connection therewith refutes this claim. In the supplemental brief, counsel refer to the case of State ex rel. v Farmers Merchants Bank, 118 Neb. 495 (225 N. W. 669) and quote at length from the court's decision in this case. Counsel make the statement that of all the cases cited, this is nearest analogous to the instant case. In our judgment the case is not analogous but is very easily distinguished.

In the first place it was a civil action. The bank had been closed for liquidation. A man by the name of Kranberg had formerly been the president and general manager of the bank and he had also been an executor of an estate and, as such, had an executor's account in the sum of $8000.00 and certificates of deposit on the bank in the sum of $10,000.00.

In the interest of assisting the bank's statement, Kranberg, the president and general manager, had illegally transferred all the assets held by him as executor to other accounts in the bank. This was wholly a bookkeeping transaction. After the bank was closed a successor executor sought to have the assets restored to the estate. The Supreme Court of the state of Nebraska so ordered. We fail to see how it could be determined otherwise. This decision does not necessarily determine that Kranberg might not have been guilty of some criminal action but whether he could or not, there would still be a marked distinction with the instant case. In the Nebraska case the court made the following observation:

"had the funds been actually withdrawn, it would have presented a different problem, but such was not the case. The thing Kranberg did relative to this deposit, he did in performance of banking functions."

Menke actually did withdraw funds from the Marker estate. What he did was not in the performance of banking functions. His every move was to help the milk company of which he was a stockholder. The very name "Milk Fund" would so argue. His creation of the account known as the milk fund, his permitting the dairy company to overdraw its account as contemporaneous acts, Menke may not escape his responsibility by a showing that the dairy company's overdraft occurred first. The permitting the dairy company to overdraw its account was his act and was illegal. The dairy

company at that very time was insolvent, as he must have known. As bearing on the question of intent, we find that this milk fund account was continued for a period of about four and one-half years. The only inference is that it was continued for the purpose of helping the dairy company, an insolvent institution. During this period of time the administrator account was milked to the point that it only had about $65.00 balance. More than $4000.00 was withdrawn from the administrator's account. We understand that the state's case was limited to $1500.00 but the other matters may be considered in the interests of determining intent.

The jury had a right to draw an inference that when Menke authorized the dairy company to have an overdraft, he knew where he could procure the money to take it up. It was a conceived plan to use the Marker estate money to bolster the dairy company's status. The mere fact that the bank might be liable by reason of the improper acts of its cashier does not meet the question in this criminal prosecution.

The funds of the estate were actually appropriated and withdrawn from the bank. After the estate fund was exhausted, the dairy company folded up, went into liquidation and was found to be hopelessly insolvent. Its Board of Directors had to make up a deficit on their obligations as note endorsers. The defendant, Menke, recognized that the funds had actually been withdrawn from the bank. This is evidenced by the fact that a few months before the return of the indictment against him he negotiated some personal security holdings and paid the net amount into the bank to the credit of the administrator's account.

The original counsel for the defendant argue that so long as the defendant Menke possessed assets sufficient in amount to take care of any withdrawals from the estate account, that he could not be guilty of embezzlement or the converting of the money in the administrator's account to his own use. We do not think this is a correct statement of the law and we know of no well considered opinion so holding.

We have not found it necessary to make reference to the numerous cases cited in supplemental brief of counsel for the defendant. Suffice it to say that we have examined each and every one of them. We do not think they apply to the factual condition existing in the instant case.

The application for rehearing will be overruled.

BARNES, P. J., HORNBECK and GEIGER, JJ., concur.